# THE PEOPLE OF THE STATE OF NEW YORK, Plaintiffs in Error, *v.* CHARLES BENNETT, Defendant in Error.

*Indictment—Requirement in an—Larceny—Special Property in Agent—Jurors' Challenge—Interest.*

The distinction between the *commencement* and the *caption* of an indictment stated by Fullerton, J.

"The Jurors of the People of the State of New York in and for the body of the county of Cortland, upon their oaths present," &c., is a sufficient *commencement.*

A *caption* is no part of the indictment, and is only used when the proceedings are removed from an *inferior* to a *superior* court, by error, &c., and it consists wholly of the history of the proceedings in finding the indictment in the inferior court. Thus the history names the *court* where the indictment was found, the *jurors' names* by whom found, and the *time* and *place* of the finding of the same, with such averments as to show regularity and jurisdiction.

A person employed by the superintendent of the poor in a county to purchase provisions for the poor-house, &c., has neither a *general* nor *special* property in the property thus purchased.

The office of superintendent of the poor is a mere agency of the county, and may be considered as having a special property in provisions purchased for the use of the poor. But the actual property is in the county, and, when stolen, should be laid in the indictment as the property of the county.

This cause comes into this Court by writ of error, on the part of the People, from a judgment of the Supreme Court in the Sixth District, reversing a judgment of the Cortland County Sessions, and discharging the Defendant absolutely out of the State prison at Auburn, the conviction having been for a felony.

At the March Term of said Court of Sessions, 1866, the Defendant was indicted for having, on the 12th of that month, within said county of Cortland, feloniously stolen, taken, and carried away a quantity of pork, of the value of one hundred and thirty dollars, of the goods, chattels, and personal property of one Alonzo W. Gates. A second count recited the same transaction, only that it alleged the pork to be the property of the county of Cortland.

After the trial of the indictment had been moved by the District-Attorney, the Defendant's counsel asked the Court to direct the

District-Attorney to elect upon which count he would try the Defendant. The Court refused so to direct, and the Defendant's counsel excepted.

The counsel for Defendant then interposed a challenge to the array of jurors, on the ground that the jurors, being residents of the county of Cortland, and thus having an interest in the property mentioned in the second count, were disqualified from sitting as jurors on the trial. The Court overruled the challenge, and the counsel for the Defendant excepted. Each separate juror, as called, was challenged on the same ground, but they were admitted to sit, under the like exception.

After the jury had been empanelled and sworn, and the cause opened to the jury by the District-Attorney, the Defendant's counsel moved to quash the indictment, on the grounds :

1st. That it did not appear on the face of the indictment that it was found or presented by a grand jury.

2d. That it did not so appear that it was found and presented by the requisite number of grand jurors.

3d. That it was not alleged that the grand jury were charged and sworn by the Court of Sessions to inquire for the People of the State and for the body of the county.

4th. That it did not appear on the face of the indictment that the same was presented by a grand jury, and at a Court of Sessions legally constituted.

The District-Attorney objected that, after the plea of not guilty, it was too late to move to quash the indictment. The Court denied the motion to quash, and the counsel for the Defendant excepted.

On the trial it appeared that the property was stolen by the Defendant from the wood-house attached to the county poorhouse of Cortland county, of which Alonzo W. Gates was the keeper. That Gates was hired for his position by the county superintendent of the poor, by whose directions he (Gates) had purchased the pork, and that he had no interest in the property except as the employé of the superintendent, and that it was for the use of the poor-house. The superintendent ordered Gates to

buy the pork. Gates did so, getting his note discounted to pay for it, and afterward took up his note by an order of the superintendent on the county treasurer for the amount.

The counsel for the Defendant moved to quash the indictment, and afterward that the Court direct the jury to acquit, on the ground of variance—the proof showing, as he alleged, that the pork was neither the property of Gates nor of the county of Cortland. The Court denied the motions, and the Defendant's counsel duly excepted. The Defendant's counsel requested the Court to charge in substance that, under the testimony, Gates had neither a general nor special property in the pork, and that such property was not in the county, but belonged to the superintendent as a corporation under the statute. To the refusal of the Court so to charge, the counsel for the Defendant excepted.

The Defendant was convicted, and sentenced to five years' confinement in the State prison at Auburn. At a General Term of the Supreme Court of the Sixth District, held in July, 1867, the judgment of the Court of Sessions was reversed, and it was ordered that the Defendant be discharged from imprisonment. From this judgment and order the case comes by writ of error, sued out by the People, into this Court.

*John H. Reynolds* for Appellant.
*A. J. Parker* for Respondent.

FULLERTON, J.—After the plea of not guilty had been entered, and the trial moved by the District-Attorney, the counsel for the prisoner made a motion to quash the indictment, because:

1st. It did not appear on the face of the indictment that it was found or presented by a *grand* jury.

2d. Because it did not appear on its face that it was found and presented by the requisite *number* of grand jurors.

3d. Because it was not alleged in the indictment that the grand jury were *charged and sworn* by the Court of Sessions to inquire for the People of the State of New York, and for the body of the county of Cortland.

These and similar objections are frequently made to the form

of an indictment, and it is therefore proper to consider, in the first place, what constitutes a valid presentment of a grand jury.

We have inherited from England many technical rules relating to criminal practice which have long since become obsolete. They had their origin in that period of English history when the most trivial offence was punishable with death, and when it was almost a foregone conclusion, if the sword of justice was drawn, that it must be returned bathed in blood. It is not to be wondered at that humane Judges should have been found, in such an age, willing to save life by attaching importance to objections, purely technical, to the form of the indictment which placed the accused on trial. An advanced civilization, and a more humane administration of the law, have removed the causes which gave rise to these technical rules, and there is therefore no good reason for retaining them. Ratione cessante, lex ipsa cessat. So thought our legislature when it passed the statute of jeofail, and enacted that no indictment should be deemed invalid by reason of the omission of the Defendant's title or occupation, or by a misstatement of them, or of the town or county of his residence, where the Defendant shall not be prejudiced thereby ; or by an omission of the words " with force and arms," or words of similar import, or by an omission to charge any offence to have been committed contrary to a statute, or by reason of any other defect or imperfection in matters of form which shall not tend to the prejudice of the Defendant.

This statute swept away many of the objections to the forms of indictments which, at times, seriously interfered with an effective administration of criminal justice. A more liberal practice began to prevail at an early day in England. Bacon says : " Some indictments have been quashed for an omission of the names of the jurors; and others for want of the words *good and lawful men ;* and others for want of the words *and then and there sworn and charged ;* and others for want of the words *to inquire for the King and for the body of the county ;* yet of late years exceptions of this kind have not been much favored, especially if the indictment were in a superior Court, *and that*

*which is omitted be, in common understanding, implied in what is expressed*" (Bacon's Ab. I. Indictment).

This is a sound rule, and one that it is safe to follow. It does not deprive an accused party of a fair trial on the merits, nor does it, on the other hand, open an easy door for an escape on technical grounds. Applying this rule, the form of this indictment should be considered good if the omissions complained of are, in common understanding, implied in that which is expressed.

That part of the indictment which is complained of as defective is as follows:

" Court of Sessions:

" Cortland county, *ss.* The jurors of the People of the State of New York, in and for the body of the county of Cortland, upon their oaths present."

Then follow apt words charging the Defendant with the commission of a larceny. Here are all the requisites of a good commencement to an indictment. It plainly appears to have been found in the Court of Sessions for the county of Cortland, and by the jurors of the people for said county. It is true that it does not allege that it was found by a *grand* jury, or by the legal *number* of grand jurors; but these are plainly implied, because that body, legally constituted, alone have the power to present any one for trial.

This has been frequently decided (McClure *v.* The State, 1 Yerger, 206, per Catron, J.).

The form of this indictment is identical, mutatis mutandis, with that long since adopted in England, and which has obtained in most of the States in our own country.

The form used in England nearly three hundred years ago was, " Ivratores pro domina regina presentant, quod," &c. (West's Symboleography, Part 2, p. 96). And it has been continued without exception to the present day. A great deal of confusion, however, exists in the books, because the distinction between the *commencement* and the caption of an indictment, which has always existed in England, has not uniformly been maintained here. " The whole question as to what the *caption*

should contain" (says Bishop in his Treatise on Criminal Procedure, § 154) "appears, when approached through the American books, draped in mist and girded about with darkness." Observing the proper distinction between the *caption* and the *commencement* of an indictment, no valid objection will be found to the one in this case. The caption is no part of the indictment. It consists wholly of the history of the proceedings when an indictment is removed from an inferior to a superior Court.

As I have already stated, the form of an indictment, in many of our own States, and which is derived from England, is thus: " The jurors of the People of the State of ———, in and for the body of the county of ———, upon their oath, present," &c. This is the *commencement* and all that it need contain. The caption is quite a different matter, and it had its origin in this way. Where an inferior Court, in obedience to the mandate of the King's Bench, transmitted the indictment to the crown office, it was accompanied with its history, naming the *Court* where it was found, the *jurors' names* by whom found, and the *time and place* where found. All this was entered of record by the clerk of the *superior Court* immediately before the indictment, and was called the *caption;* but it was no part of the indictment itself (Bishop on Cr. Pro., vol. i., §§ 145, 146; 1 Starkie's Cr. Pl., 2d ed. 233). A complete form of the caption is given in 2 Hale's P. C. 165, and in 1 Chitty's Cr. Law, 327.

This same practice prevailed in our State when indictments were removed from the Sessions to the Supreme Court, as will be seen in the case of The People *v.* Guernsey (3 John. Cases, 266), quoted by the Respondent.

It often occurred that these captions were defective in the statement of facts sufficient to show that the inferior Courts, where they were found, had jurisdiction. Then followed a motion in arrest of judgment, and decisions as to the requisites of a caption, viz.: that it should contain an averment that the indictment *to which* it was prefixed was found by a *grand* jury of good and lawful men, giving their names, and that they had been then and

there sworn and charged, &c., &c. (vide Bishop's Cr. Pro., § 155, vol. i., note 1). The same doctrine is aptly stated in Burns' Justice, vol. iii., p. 372, in these words : " The caption of the indictment is no part of the indictment itself " (2 Hale, 165) ; " but it is the style, or preamble, or return that is made from an inferior Court to a superior, from whence a certiorari issues to remove ; or when the whole record is made up in form ; for, whereas the record of the indictment, as it stands upon the file in the Court wherein it is taken, is only thus : *The jurors for our lord the King upon their oath present.*" The difficulty in our practice has grown out of the error of regarding these decisions as furnishing a test of what the indictment itself should contain, rather than its caption, when removed to a superior Court. The consequence is, that in some of the States there have been introduced into the commencement of the indictment the averments necessary to make a good caption, thus confounding the two (Bishop's Cr. Pro., § 149, note 2). This has led to great diversity of practice, and, necessarily, to confusion ; and it will be readily seen that the decisions of such States upon these questions have no application here, for the English practice has been adopted in our own State (Barb. Cr. Treatise, 180).

So far, therefore, as the objections in this case go to the form of the indictment, the latter must be considered good. Should an indictment be found in an improper manner, or by an insufficient number of jurors, the way is open for redress by motion, which secures to the accused party immunity from an illegal trial or punishment (State *v.* Batchelor, 15 Misso. 207, 208 ; Reg. *v.* Heane, 9 Cox Cr. C. 433, 436 ; 10 Jurist, N. S. 724 ; 3 Q. B. 238 ; Bishop's C. P., § 448).

I pass to the consideration of the other questions arising in this case.

To constitute a good indictment for larceny, the thing stolen must be charged to be the property of the *actual owner*, or of a person having a special property as *bailee*, and from whose possession it was stolen ( 2 Arch. C. P., 7th ed. 257 ). Gates was neither the actual owner nor the bailee of the property stolen, and the

first count in the indictment is therefore bad. He was employed by the county superintendent of the poor of Cortland county at a salary. The last-named officer is clothed by statute with the power "to employ suitable persons to be *keepers* of the poor-houses" (2 R. S., 5th ed. 841, § 34). And it was under this power that Gates was employed. The superintendent is, by the same statute, authorized "to purchase materials" for the support of the paupers.

It is true that, in this instance, the keeper purchased the property stolen with his own money; but it was an advance made for the superintendent, and he was by him subsequently, and before the larceny, reimbursed.

Neither was Gates in the actual possession of the property so as to have a *special* property therein. The character of his possession depends upon the tenure by which he held the property. If he were the mere servant of the actual owner, the possession was in such owner, not in him. If he were the servant, then the distinction between the *charge* and the *possession* of the property must not be overlooked. This distinction, though in ordinary language lost sight of, is necessary to be observed in dealing with the question under consideration.

Whilst no man is so high as to be above the reach of the law, no one is so low as to be beneath its protection. It is necessary, therefore, that we should observe critical distinctions in charging a man with a crime, lest his life or liberty be twice placed in jeopardy. And such a case might arise if the Defendant were again indicted for the same larceny, alleging the property to be in the *master*. Whilst, therefore, in the popular use of the terms, the servant is said to be in *possession* of the master's property, yet, in contemplation of law, he has the charge only. In this case, Gates could have been removed at the mere caprice of the superintendent, and his possession of the property was not such that he could have maintained a civil action for it against the thief. Indeed, if *he* had taken the property in the manner and with the design with which the thief did, he could have been convicted of a larceny (Coats *v.* The People, 4 Parker, 662).

Chitty thus states the rule: "It is a clear maxim of the common law, that where one has only the bare charge or custody of the goods of another, the legal possession remains in the owner, and the party may be guilty of trespass and larceny in fraudulently converting the same to his own use. Thus, a butler may commit larceny of plate in his custody, or a shepherd of sheep. The same of a servant intrusted to sell goods in a shop. This rule appears to hold universally in the case of servants, whose . possession of their master's goods, by their delivery or permission, is the possession of the master himself" (vide 1 Denio, 123, and cases there cited).

Adopting this as the rule, what practical distinction can be drawn between the relations which the butler, the shepherd, and the servant intrusted to sell goods, bear to their respective masters, and that which Gates bore to the superintendent who employed him? The position, therefore, that as a mere servant the possession of Gates was sufficient to support the allegation in the indictment cannot be maintained (Dillenback *v.* Jerome, 7 Cow. 294; Commonwealth *v.* Morse, 14 Mass. 217).

There is another class of cases involving the possession of property, much relied upon on the argument, which it is necessary to notice. They are cases where the question arose as between *master* and *servant*, where the servant was indicted for stealing from the master, and where the property stolen, though received by the servant *for* the master's use, had never *actually* passed from the latter to the former. The rule in such a case is, "that if the servant have done no act to determine his original, lawful, and exclusive possession, as by depositing the goods in his master's house, or the like, although to many purposes, and as against third persons, this is in law a receipt of the goods by the master, yet it has been ruled otherwise in respect of the servant himself, upon a charge of *larceny* at common law, in converting such goods to his own use" (2 Russ. on Crimes, 401, 4th ed.; 2 East's P. C. 568). This rule has no application to the case under consideration.

In the second count the property was alleged to be in the county of Cortland, and it is argued that it is bad for that reason.

It is claimed that the property was vested in the superintendent of the poor as a body corporate, and that, even if it were the property of the county, such property should have been alleged to be in the Board of Supervisors. To establish this latter proposition, the act is quoted which provides that "all acts and proceedings by or against a county in its corporate capacity shall be in the name of the Board of Supervisors of such county" (1 R. S., 5th ed. 846, § 3). Notwithstanding this statute, the Board of Supervisors as such possess no corporate powers (Brady *v.* The Supervisors of New York, 2 Sand. S. C. R. 460). The county is made a corporation by statute (1 R. S., 5th ed. 846, § 1; Brady *v.* Supervisors, supra); and amongst its corporate powers is the right to purchase and hold such personal property as may be necessary to execute its corporate or administrative powers (§ 1, subd. 3). The statute designating the name in which legal proceedings by and against the county should be conducted was designed to simplify and lessen the expenses of litigation, and not to change the title of the corporation or the name in which the property should be held.

Instances of similar legislation are not wanting. Actions by and against banks, formed under the general banking law, may be by or against the president thereof (2 R. S., 5th ed. p. 560, §§ 194, 195). And a joint-stock company or association may sue and be sued in the name of its president or treasurer for the time being (3 R. S., 5th ed. 777).

But it is contended that the title to the property stolen was vested in the superintendent of the poor, as a corporate body, he having purchased the same in his name for county purposes, and that it should have been so laid in the indictment. This position cannot be maintained. The office of superintendent of the poor, although invested with corporate powers, is a mere agency of the county. The person who fills the office is required to give a bond to the supervisors for the faithful discharge of his duty, and is authorized to draw, from time to time, on the county treasurer, for all necessary expenses incurred in the discharge of his trust. This creates the relation of principal and agent, and in no sense can the prop-

erty bought by this officer be regarded as his.    Considering, how-
ever, the nature of his office, he might be regarded as having a
special property in the things stolen, so as to have made it proper
to allege the property as belonging to him; but, at all events, it
was the property of the county of Cortland, and it was proper so
to charge it.

My conclusion, therefore, is that the second count of the indict-
ment is good, and that the judgment should be reversed.

Concurring: PORTER, WRIGHT, BOCKES, GROVER, JJ., and DA-
VIES, Ch.J.


DAVIES, CH.J.—The Defendant in error was indicted in the
Cortland Sessions for grand larceny, in stealing from the county
poor-house a quantity of hams, which had been procured for the
support of the poor of the county.

The indictment contained two counts.    The first count alleged
the property taken to be that of Alonzo W. Gates, who, at the
time of the larceny, was the keeper of the county poor-house,
and had the custody and charge of the property there, and had, in
fact, purchased these identical hams with his own money, by the
direction of the superintendent of the poor of the county.

Before the larceny he had been reimbursed by a draft on the
county treasurer of that county, which had been paid.

The second count of the indictment alleged the hams to be the
property of the county of Cortland.

The Defendant was found guilty as charged in the indictment,
and was sentenced to imprisonment in the State prison for the
term of five years.

Upon a writ of error brought to the Supreme Court, that
Court reversed the judgment and conviction, and ordered the
discharge of the prisoner upon the ground that the property taken
was that of Benjamin, the county superintendent of the poor, and
that it was erroneous to charge in the indictment that the same
was the property of Gates.    The people bring their writ of error
to this Court.

It is now insisted on the part of the prisoner that the possession

by Gates of the property taken was not of such a character as authorized the averment in the indictment that it was the property of Gates. It is undeniable that in an indictment for larceny it is essential that the pleader should aver the title or ownership in the property stolen to be in the true owner, if known ; and if not known, then it should be averred that the owner was to the jurors unknown.

This is a general rule in criminal pleading, and, in applying it, it has been held that the owner was one who had a general or special property in the thing taken. In the present instance, Gates had purchased the property taken with his own money, and he had, at the time of the theft, as keeper of the county poor-house, the actual possession and control of the stolen property. After the purchase by him, and before the larceny, he had been . reimbursed the amount of his expenditure, by a draft on the county treasurer of the county of Cortland, and on payment of which, out of the funds of the county, it would seem to be clear that the hams stolen became the property of the county of Cortland. I cannot find any warrant for saying that the same was the property of Benjamin, the superintendent of the poor of that county ; neither can I assent to the position that Gates, the keeper of the county poor-house, was the servant of Benjamin, the superintendent. If a servant at all, he surely was that of the county, whose agent he was, and the circumstance that the superintendent was the source of his appointment did not make him the servant of that officer. The latter was, in fact, but the agent or servant of the county, and whatever he did as such was done for and in behalf of the county of Cortland. As well might it be said that the numerous officers throughout the State authorized to be appointed by the Governor, by his appointment of them become thereby his servants, instead of, as they are in truth, in common with the Governor himself, the agents and servants of the people of the State.

The absolute owner of the property stolen must, therefore, be held to be that of the county of Cortland, whose money was taken and applied for the purchase thereof. The question then arises

whether the averment in the indictment, that the ownership was in Gates, the agent or servant of the county, who had the actual possession and control of the property at the time of the larceny, was not itself sufficient. The cases abundantly sustain the position that an averment of ownership in the person having the actual possession and control of the thing stolen, at the time of the theft, is all that is required.

In a modern case in England, where a stage-coach had been robbed of a box containing a variety of articles, it became material to determine whether the goods so stolen could be laid as the property of the coachman. There were three counts in the indictment; but one of them, which laid the property in the coach proprietors, failed, on account of a variation; another, which laid the property in persons unknown, was rejected by the Court as improper; and the case, therefore, necessarily proceeded upon the remaining count, which laid the property in the coachman.

It appeared in evidence that the box was delivered by the servant of a tradesman in London to the book-keeper at the inn from which the coach set off, who called it over amongst other things in the way-bill, and he delivered it to a porter, who put it into the coach; and that the coachman, in whom the property was laid, drove the coach to a place about thirty-eight miles from London, during which journey the box was stolen from the coach by the prisoner. It also appeared that the proprietors of the coach never called upon the coachman to make good for any loss, except when it happened by his neglect, and that for goods stolen privately from the coach they never expected any compensation from the driver. The jury having found the prisoner guilty, the case was stated for the consideration of the judges, and after it had been ably argued, and much considered, a majority of the judges were of opinion that the property was well laid to be in the driver. Hotham, B., who delivered the opinion, said "that the material question was whether the driver had the possession of the goods, or only the bare charge of them, but that the case was not open to that distinction; for although as against his employers, the masters of the coach, the mere driver can only have the bare charge of the prop-

erty committed to him, and not the legal possession of it, which remains in the coach-master, yet, as against all the rest of the world, he must be considered to have such a special property therein as will support a Court in charging them as his goods; for he had, in fact, *the possession and control of them*, and they are intrusted to his custody and disposal during the journey. . . That the law, therefore, on an indictment against the driver of a stage-coach, or on the prosecution of the proprietors, considers the driver to have the bare charge of the goods belonging to the coach; but, on a charge against any other person for taking them tortiously out of the driver's custody, he must be considered as the possessor, and therefore it was well said that he was the owner" (Rex *v.* Deakin & Smith, O. B. 1800; 2 Leach, 862, 876; 2 East's Cr. L., ch. 16, § 90, p. 653).

In the case of Regina *v.* Rudick (8 Car. and P. 237), Busby was the servant of Webb, and was sent out by his master to receive money for him from his customers, and he was robbed of such money before it reached his master, on his way home. In the indictment the property was laid as that of Webb; and prisoner's counsel contended that it could not be laid as the property of Webb, as it had never reached his hands, except by the possession of his servant.

Mr. Baron Alderson was inclined to think the money could not be laid as the money of the master, but, as the grand jury was in session, recommended that a new indictment be found, which was immediately done, which laid the money, in one count, as the property of Busby, the servant, and in the other as the property of Webb, and on this indictment the prisoner was convicted. In Regina *v.* Bird (9 Car. and P. 44) it was held that it was well laid in the indictment that the property stolen was that of one Miers, although he had only the possession of it, one Keyzor being the actual owner. "Whenever a person has a special property in a thing, or holds it in trust for another, the property may be laid in either (21 Maine, 586; 22 Maine, 171; 4 Car. and P. 391; 8 Texas, 115); as for instance, goods left at an inn (2 East's P. C. 658), or entrusted to one for safe-keeping (1 Leach, 356; Rex *v.* Statham,

ib.), or cloth left with a tailor, or linen with a laundress" (Wharton's Cr. Law, vol. ii., §§ 1824, 1830).

In Owen v. State (6 Humph. 330), a horse got loose from his owner, Booth, and was taken in the field of Edmondson, and was placed in his stable, from whence it was stolen.

It was held that the property was well laid in Booth, the owner, and also in Edmondson, the temporary possessor; that the horse was in the constructive possession of the owner, and in the actual possession of Edmondson, and that the indictment might well allege the property to be in the owner, or in the third person in whose possession it was at the time of the larceny; and it was also held that a general finding of the jury, on both counts of the indictment, was well sustained by the proof, and the conviction legal and regular.

But the principle of these cases has been recognized and affirmed by the Courts of this State.

In Ward v. The People (3 Hill, 395), the prisoner was indicted and convicted of stealing property from one Flagg, and the indictment averred that the property stolen was the property of Flagg. It in truth was the property of another, and Flagg had himself stolen it from the true owner. Flagg was asked on the trial if he had not stolen the butter. The Court, in its opinion, says: "If the question had been answered in the affirmative the fact would have been immaterial, because possession of property in the thief is sufficient to make it the subject of larceny; and the title may be laid either in the owner or in the thief." This case was taken to the Court for the Correction of Errors, and the judgment of the Supreme Court there affirmed (6 Hill, 144). Senator Foster read an opinion combating the views of the Supreme Court, that possession of the thing stolen was sufficient to authorize an averment of ownership in the possessor; but his views received only the assent of five senators, who voted for reversal, and fourteen members of the Court voted for the affirmance of the judgment. We are authorized, therefore, to assume from these cases, that Gates having the actual possession of the goods stolen, it was well laid in the indictment that he was

the owner thereof. That if there could be any doubt on that subject, the county of Cortland must be considered to have been the true owner of the property; and that a conviction upon an indictment containing two counts, one of which laid the ownership in the actual possessor of the goods stolen, and the other in the true owner, is good, and should be sustained.

There remains to be considered some other objections urged by the prisoner's counsel. The prisoner's counsel challenged the array of jurors, on the ground that the property stolen, being alleged in the second count to be that of the county of Cortland, the jurors, being inhabitants of said county, were interested, and therefore disqualified to act as such. This challenge assumes that the property stolen was the property of the county of Cortland. This assumption we deem to be correct. But in our judgment this fact furnishes no ground of disqualification of a juror, being an inhabitant of that county, to sit on an indictment of the thief. Can it be seriously urged that, if the State Capitol is fired by an incendiary, that all the inhabitants of the State are disqualified to sit as jurors on his trial, because the building destroyed is the property of the State, and all the inhabitants of the State are interested in the property of the State? The statement of the proposition carries with it its own refutation. The Court properly overlooked the challenge. We think there was no reason for quashing the indictment upon the ground suggested.

The indictment showed, upon its face, that it was presented in the Court of Sessions of Cortland county, by the jurors of the People of the State of New York, in and for the body of that county, and that they presented the same upon their oath.

We think this indictment is in the usual and approved form, and contains all the requirements of the statute.

It is also claimed that the Judge erred at the trial in refusing to charge the jury, in the language of Mr. Justin, that "in cases of felony confessions are regarded as the weakest and most suspicious of all testimony; liable to be obtained by artifice, false hopes, promises of favor, or menaces; seldom remembered accu-

rately, or reported with precision, and incapable in their nature of being disproved by other negative evidence" (4 Black. Com. 357).

It is to be observed, in the first place, that Blackstone uses this language in connection with his criticisms upon State trials for treason in England; and, although he intends his observations to have a general application to all cases of felony, he regarded them as primarily to be considered in State trials for treason. But the annotator, upon this text of Blackstone, thus remarks, in a note : " It seems to be now clearly established that a free and voluntary confession by a person accused of an offence, whether made before his apprehension or after, whether on a judicial examination or after commitment, whether reduced to writing or not—in short, that any voluntary confession, made by a prisoner to any person, at any time or place, is strong evidence against him ; and, if satisfactorily proved, sufficient to convict without any corroborating circumstances. But the confession must be voluntary, not obtained by improper influence, nor drawn from the prisoner by means of a threat or promise ; for, however slight the promise or threat may have been, a confession so obtained cannot be received in evidence, on account of the uncertainty and doubt whether it was not made rather from a motive of fear or of interest than from a sense of guilt" (citing Phil. Ev. 86).

Such undoubtedly is the rule, as enunciated by the most authoritative text-writers. Burrill on Circumstantial Evidence, says : " Confessions of this kind, when deliberately and voluntarily made, are jointly regarded as constituting the highest and most satisfactory species of evidence that can be presented before a tribunal " (citing numerous authorities). Greenl. upon Evidence (vol. i., § 214), while sanctioning this doctrine, very properly observes that " the evidence of verbal confessions of guilt is to be received with great caution." And he adds, in § 215 : " Subject to these cautions, in receiving and weighing them, it is generally agreed that deliberate confessions of guilt are among the most effectual proofs in the law. The degree of credit due to them is to be estimated by the jury, under the circumstances of each case." In Coon *v.* The State (13 S. M. & M. 246;

McCann v. The State, ib. 471), the learned author says: "A free and voluntary confession of guilt made by a prisoner, whether in the course of conversation with private individuals, or under examination before a magistrate, is admissible in evidence as the highest and most satisfactory proof, because it is fairly presumed that no man would make such a confession against himself if the facts confessed were not true." He adds in a note: "Mr. J. Blackstone and Mr. J. Foster entertained a different opinion;" and then quotes from 4 Black. 357, and from Mr. J. Foster, and further says: "And the highest authorities have now established that a confession, if duly made and satisfactorily proved, is sufficient alone to warrant a conviction, without any corroborating evidence aliunde," citing numerous authorities (2 Russ. on Cr., p. 824).

The Court committed no error, therefore, in refusing to charge the jury in the language requested.

In view of these considerations, the judgment of the Supreme Court should be reversed, and the judgment of the Court of Sessions of Cortland county be affirmed; and the record is remitted to the Supreme Court to proceed therein according to law.

Reversed.